IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 20-cv-00322-WJM-MEH

RENE LIMA MARIN,

    Plaintiff,

v.

UNITED STATES OF AMERICA, and
THE GEO GROUP, INC.,

    Defendants.
_____

**DEFENDANT GEO'S MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT & JURY DEMAND (DOC. 64)**
_____

Defendant THE GEO GROUP, INC. ("GEO") hereby submits its Motion to Dismiss Plaintiff's Second Amended Complaint & Jury Demand (Doc. 64) (herein, "2AC") pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(5) and, in support thereof, states as follows.

**CONSULTATION AND COMPLIANCE WITH PRACTICE STANDARD III(D)(1)**

Undersigned counsel conferred with counsel for Plaintiff regarding deficiencies in the first Amended Complaint and Plaintiff addressed some, but not all, of the identified deficiencies by filing a Second Amended Complaint. Counsel for Plaintiff has, after further conferral, advised undersigned counsel that he opposes this motion. Counsel for Defendant United States of America does not oppose this motion.

## NATURE OF THE CASE

This matter arises out of a February 6, 2018, incident in which ICE detainee Rene Lima-Marín ("Plaintiff"), while detained at the Aurora Detention Facility ("ADF") – a facility operated by GEO Group, Inc. ("GEO") – purportedly slipped and fell, striking his face on the edge of a toilet in his cell.

On February 6, 2020, suit was filed in Colorado federal district court by Plaintiff against GEO and the United States. The 2AC was filed on July 22, 2020. The claims for relief against GEO are:

- Second Claim:  28 U.S.C. § 1350 – Alien Tort Statute - Cruel, Inhuman, and Degrading Treatment;

- Third Claim:  Negligence – Medical Care.

## ALLEGATIONS IN THE 2AC

Plaintiff alleges that, following his February 6, 2018, fall, GEO staff escorted him to the ADF medical unit where it "seemed to [him]" that the nurses were confused, gave him only Ibuprofen, and, over an hour later, GEO transported him to a hospital. Doc. 64 at ¶¶ 7, 45, 47, 49, 50, 52. Physicians at the hospital found that Plaintiff had fractured multiple bones in his face and that he was prescribed pain killers and advised that he "would require surgery in the next week or two if [he] was to avoid the risk of permanent impairment." *Id.* at ¶¶ 7, 54-57. He claims, however, that GEO returned him to ADF where medical staff refused to fill his prescription for pain medication written by hospital physicians but, instead, gave him "far weaker" medication and staff sometimes failed to include his medication on the cart during medication rounds – giving him instead Ibuprofen. *Id.* at ¶¶ 8, 65, 67.

Plaintiff alleges that, two weeks after his injury, he saw Dr. Jeffrey Peterson,[1] who accused him of exaggerating his injuries and of abusing staff and refused to see him, after which GEO staff refused to fill or provide him his prescription medication. *Id.* at ¶¶ 75-85. He also alleges that GEO was required to request, and ICE to approve, his return to the hospital for surgery but that it was not until approximately one month later that he was taken to an "eye doctor" who advised him that the bones in his face had begun to heal and would require re-fracturing to be repaired. *Id.* at ¶¶ 10, 89, 92-93. Plaintiff was released from ADF on March 26, 2018. *Id.* at ¶¶ 11, 96.

## ARGUMENT

### I. PLAINTIFF'S SECOND CLAIM FOR RELIEF BROUGHT PURSUANT TO THE ALIEN TORT STATUTE SHOULD BE DISMISSED

Plaintiff alleges that "Defendant GEO subjected [him] to cruel, inhuman, and degrading treatment" through its "withholding medical care" and providing "inadequate medical care" in violation of "universally accepted, and obligatory norm of international law" in violation of the Alien Tort Statute, 28 U.S.C.A. § 1350 ("ATS"). Doc. 64 at ¶¶ 113, 116. This Court does not have jurisdiction to hear such claim or, alternatively, Plaintiff fails to state a claim under the ATS.

#### A. Legal Considerations

Pursuant to the ATS, United States district courts have original jurisdiction for "any

---

[1] Although counsel for Defendant has demonstrated to Plaintiff that he incorrectly describes Dr. Peterson as a GEO employee and that Dr. Peterson was, rather, a contract medical provider hired through Correct Care Solutions, LLC, Plaintiff has consistently through two amendments to the Complaint, failed to correct this error. This factual error is not, however, material to this motion.

3

civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." The ATS remained largely dormant until 1980 when, in *Filartiga v. Pena–Irala*, 630 F.2d 876 (2nd Cir.1980), the Second Circuit found jurisdiction under the ATS for claims of family members of a man tortured and murdered by Paraguayan police officers. When family members discovered that one of the Paraguayan police officers was living in New York, they filed suit against him. The Second Circuit, relying on the "universal acknowledgment" that acts of official torture are contrary to the law of nations, permitted the case to go forward under the ATS. *Id.* at 890. The United States Supreme Court did not review *Filartiga,* but has since decided several cases bearing on the ATS.

*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004), involved a claim by a Mexican national, Alvarez-Machain, that the Drug Enforcement Administration (DEA) approved using Sosa and other Mexican nationals to abduct him from Mexico to stand trial in the United States for the torture and murder of a DEA agent. *Id.* at 698. Following acquittal, Alvarez-Machain sued Sosa for violating the "law of nations" under the ATS. The district court granted summary judgment for Alvarez-Machain, awarding damages on the ATS claim, and the Ninth Circuit affirmed. The Supreme Court, in an opinion by Justice Souter, reversed, taking a narrow view of the ATS and holding that it is a jurisdictional statute enacted on the understanding that common law would provide a cause of action for only a "modest number of international law violations" that existed at the time of its enactment. *Id.* at 720. While not ruling out ATS claims based on present-day "law of nations," Justice Souter observed that any such claim should rest on an international norm universally

4

accepted by the civilized world and defined with specificity comparable to the features of the 18th-century paradigms of offenses – those being claims against ambassadors, violations of safe conduct, and piracy – that Congress had in mind when it enacted the ATS. Justice Souter concluded that district courts should exercise caution in deciding to hear claims allegedly based on present-day law of nations – limiting such claims to violations of international law that set out "a norm that is specific, universal, and obligatory." *Id.* at 724-725, 732-33. *See also* K. Kemper, *Construction and Application of Alien Tort Statute (28 U.S.C.A. § 1350) - Parties,* 61 A.L.R. Fed. 2d 171 (2012).

Justice Scalia, joined by Chief Justice Roberts and Justice Thomas, concurred in the result in *Sosa* but only in part in the reasoning, stating that as the ATS is a jurisdictional statute that created no new causes of action it could not, based the abrogation of federal common law,[2] justify any underlying authority for federal courts to recognize unstated causes of action under the statute – whether based on the restrained discretion urged by the majority or otherwise. *Sosa,* 542 U.S. at 740-41. Justice Scalia went on to note that: "By framing the issue as one of 'discretion,' the Court skips over the antecedent question of authority. This neglects the 'lesson of *Erie*,' that 'grants of jurisdiction alone' (which the Court has acknowledged the ATS to be) 'are not themselves grants of lawmaking authority.'" *Id.* at 744 (internal citations omitted).

In 2013, the Supreme Court decided *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 116 (2013). There, it was alleged that certain foreign holding companies had, through

---

[2] *Erie v. Tompkins*, 304 U.S. 64 (1938).

a Nigerian subsidiary, aided and abetted the Nigerian Government in human-rights abuses. *Id.* at 123. The Second Circuit had held that the ATS did not extend to suits against corporations. *Id.* at 120. Affirming the Second Circuit, but on different grounds, the Supreme Court held that "all the relevant conduct took place outside the United States" and dismissal was required based on the presumption against extraterritorial application of statutes. *Id.* at 124. The Court left unresolved the broader holding of the Second Circuit that dismissal was required because corporations may not be sued under the ATS.

Five years later, in *Jesner v. Arab Bank, PLC*, __ U.S. __, 138 S. Ct. 1386 (2018), the Court took up the question of whether foreign nationals injured or captured by terrorists in Israel could maintain an ATS action against a foreign bank which, through dollar-clearing transactions at its New York branch, allegedly financed and facilitated the terrorist activities. Writing for a plurality, Justice Kennedy, joined by Chief Justice Roberts and Justice Thomas, noted that, while *Sosa* acknowledged that "in certain narrow circumstances courts may recognize a common-law cause of action for claims based on the present-day law of nations" in addition to the "historical paradigms" familiar when the ATS was enacted, the *Sosa* Court was "quite explicit," that "ATS litigation implicates serious separation-of-powers and foreign-relations concerns. Thus, ATS claims must be 'subject to vigilant doorkeeping.'" *Id.* at 1389, 1398 (citations omitted). Justice Kennedy went on to state that:

> Before recognizing a common-law action under the ATS, federal courts must apply the test announced in *Sosa*. An initial, threshold question is whether a plaintiff can demonstrate that the alleged violation is "of a norm that is specific, universal, and obligatory." And even assuming that, under

6

> international law, there is a specific norm that can be controlling, it must be determined further whether allowing this case to proceed under the ATS is a proper exercise of judicial discretion, or instead whether caution requires the political branches to grant specific authority before corporate liability can be imposed.

*Id.* at 1399 (internal citations omitted).

As to the first question, Justice Kennedy observed that "[t]he international community's conscious decision to limit the authority of these international tribunals to natural persons counsels against a broad holding that there is a specific, universal, and obligatory norm of corporate liability under currently prevailing international law." *Id.* at 1401. However, without resolving that question, Justice Kennedy moved to the second question – whether absent further action from Congress it would be appropriate for courts to extend ATS liability to foreign corporations. *Id.* at 1403. Justice Kennedy found "all but dispositive" Congress's decision to exclude corporations from liability under the Torture Victims Protection Act (TVPA). *Id.* at 1404. That statute, Kennedy stated, "reflects Congress' considered judgment of the proper structure for a right of action under the ATS. Absent a compelling justification, courts should not deviate from that model." *Id.* at 1403.

Justice Kennedy also pointed to the Court's holding in *Correctional Services Corporation v. Malesko*, 534 U.S. 61, 72 (2001*),* that corporations are not liable under the implied cause of action recognized in *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). *Jesner,* 138 S. Ct. at 1390. Justice Kennedy stated that "[a]llowing corporate liability would have been a 'marked extension' of *Bivens* that was unnecessary to advance its purpose" – and that "[w]hether corporate defendants

7

should be subject to suit [under the ATS] was 'a question for Congress, not us, to decide.'" 138 S. Ct. at 1403 (quoting *Malesko*, 534 U.S. at 72).

Justice Gorsuch, in his concurrence, stated that he "harbor[ed] serious doubts about *Sosa's* suggestion" that new causes of action might be recognized under the ATS, stating that "[t]o the extent *Sosa* ... claim[ed] for federal judges the discretionary power to create new forms of liability on their own, it invaded terrain that belongs to the people's representatives and should be promptly returned to them." *Jesner,* 138 S. Ct. at 1413.

Justice Thomas, writing separately, agreed with Justice Gorsuch's point that "[c]ourt's should not be in the business of creating new causes of action under the Alien Tort Statute." *Id.* at 1408. Justice Alito, in his separate concurrence, went so far as stating that "[f]or the reasons articulated by Justice Scalia in *Sosa* and by Justice Gorsuch today, I am not certain that *Sosa* was correctly decided." *Id* at 1409.

### B. Under the Reasoning in *Jesner*, Domestic Corporations Cannot Be Sued Under the ATS

*Jesner's* reasoning that the considerations that constrained judicial creation of causes of action against foreign corporations under the ATS also applies to domestic corporations. Indeed, *Jessner's* reference to the "all but dispositive" decision of Congress to exclude corporations from liability under the TVPA did not distinguish between foreign and domestic corporations. *Id.* at 1404. And, just as the Court found no "compelling justification ... [to] deviate from that model" in J*esner*, there is no compelling reason here.

Also, it follows from the cases cited in *Jesner* in support of its holding – *Correctional Services Corp. v. Malesko* and *Alexander v. Sandoval*, 532 U.S. 275, 286-87 (2001) – that

the separation of powers considerations apply to both foreign and domestic corporations.[3]

Likewise, the observation in *Jesner* that "the lack of a clear and well-established international-law rule [of corporate liability] is of critical relevance in determining whether courts should extend ATS liability to foreign corporations without specific congressional authorization"[4] applies equally to foreign and domestic corporations.[5]

### C. Plaintiff's Allegation That GEO Subjected Him to Cruel, Inhuman, and Degrading Treatment Through its Denial of Necessary Medical Care Fails to Allege Conduct That Is a Violation of an International Norm That Is Specific, Universal and Obligatory

Plaintiff contends that GEO violated his rights under the ATS as it subjected him "to cruel, inhuman, and degrading treatment" through its denial of adequate medical care. Doc. 64 at ¶ 113. However, an allegation of denial of adequate medical care fails to meet the first *Sosa* test – whether the claim fits the "narrow circumstances" in which a court may recognize a common-law cause of action that is specific, universal and obligatory. Setting aside the absence of any universally-accepted obligatory norm regarding the care of the incarcerated, the concept of "adequate medical care" is inherently non-specific. Many

---

[3] Calling on *Malesko's* reasoning in declining to create *Bivens* liability for corporate defendants, *Jesner* observed the issue was "a question for Congress, not us, to decide." 138 S. Ct. at 1403 (citation and quotation marks omitted). Similarly, in *Sandoval*, the Court deferred to Congress and refused to create a private cause of action to enforce regulations under Title VI of the Civil Rights Act of 1964. 532 U.S. at 286-87.

[4] 138 S. Ct. at 1405.

[5] It is relevant to note that in a *pre-Jesner* decision, then-D.C. Circuit Judge Kavanaugh wrote in a dissenting opinion in *Doe v. Exxon Mobil Corp.*, 654 F.3d 11, 81 (D.C. Cir. 2011), *vacated*, 527 F. App'x 7 (D.C. Cir. 2013), that "claims under the ATS are defined and limited by customary international law, and customary international law does not extend liability to corporations."

factors, including but not limited to varying laws, cultural norms, socio-economics, health care delivery systems, and availability of medical training, impact the standard of medical care and there is no universally-accepted international standard.

Noah Gillespie in *Positive Law: Providing Adequate Medical Care for HIV-Positive Immigration Detainees*, 81 Geo. Wash. L. Rev. 1329, 1353 (2013), addressed the very issue regarding the unavailability of the ATS to address a claim of inadequate care for HIV-positive immigration detainees, stating that such detainees:

> would likely not be able to bring a claim under the ATS . . . . The ATS provides federal jurisdiction over claims (1) by an alien (2) alleging a tort (3) that also violates customary international law or a treaty ratified by the United States. The ATS is primarily a jurisdictional statute and only provides an implied cause of action for violation of a "specific, universal, and obligatory" norm. Although torture meets this standard, cruel treatment is less accepted because it is deemed not to be a sufficiently "specific" norm.

*See also Guzman v. Wells*, No. CV 310-066, 2010 WL 4941485, at *4 (S.D. Ga. Oct. 26, 2010), *report and recommendation adopted*, No. CV 310-066, 2010 WL 4928876 (S.D. Ga. Nov. 30, 2010) ("contrary to Plaintiff[']s assertion, his claims do not warrant extension of jurisdiction under the Alien Tort Statute, 28 U.S.C. § 1350, because Plaintiff's claims of inadequate medical care and breach of contract do not fit within the 'very limited set of claims' arising under 'the law of nations' that would give rise to such jurisdiction").

### D.   Caution Requires Proper Exercise of Judicial Discretion

As to the second *Sosa* test, discretion counsels against recognizing Plaintiff's ATS claim as it would import broad concepts of international law into United States law regarding the treatment of its incarcerated – singling out aliens for this special treatment.

This would not only be an unwarranted expansion of ATS claims beyond the historical paradigms familiar when the ATS was enacted, it would be inconsistent with democratic notions of sovereign control of law within its own borders.[6] As stated in D. Kochan, *Sovereignty and the American Courts at the Cocktail Party of International Law: The Dangers of Domestic Judicial Invocations of Foreign and International Law,* 29 Fordham Int'l L.J. 507, 546–47 (2006) (internal cites omitted):

> Related to sovereignty and the rule of law are democracy concerns. Lawmaking power, in democracies, lies with the lawmakers as selected and directed by the people. Judges do not fit that role in the United States. Many scholars have noted the tendency of international law to erode sovereignty, to the detriment of democratic lawmaking.
>
> Thus, resort to international or foreign laws is uniquely un-American and un-democratic.

## II.   PLAINTIFF'S THIRD CLAIM FOR RELIEF FOR NEGLIGENT MEDICAL CARE SHOULD BE DISMISSED[7]

Plaintiff alleges that GEO's "staff, employees, and agents" failed to "provide[] timely or adequate medical care" including "forcing him to wait" before being transported to an outside medical facility (Doc. 64 at ¶ 122); provide, properly administer, or stock medication needed to treat Plaintiff (*id*. at ¶ 123); failing to request non-emergent follow-up treatment by outside medical providers (*id*. at ¶ 124); and that GEO is "vicariously liable for the

---

[6]   Justice Souter counseled in *Sosa* that any determination of "whether a norm is sufficiently definite to support a cause of action should (and, indeed, inevitably must) involve an element of judgment about the practical consequences of making that cause available to litigants in the federal courts." 542 U.S. at 732–33.

[7]   If the Court dismisses all federal claims, it may – of course – decline to decide this state tort claim.

actions and omissions of its staff, employees, and agents[.]" *Id.* at ¶ 127.

### A.     Legal Considerations

A party may move to dismiss a claim under Fed. R. Civ. P. 12(b)(6) where the complaint fails to allege enough facts to state a claim for relief that "is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "The burden is on the plaintiff to frame a 'complaint with enough factual matter (taken as true) to suggest' that he or she is entitled to relief." *Robbins v. Oklahoma*, 519 F.3d 1243, 1247 (10th Cir. 2008) (quoting *Twombly*, 550 U.S. at 556).

As set out in Colo. Jury Instr., Civil 15:1 Notes on Use (internal citations omitted):

> A medical malpractice action is a particular type of negligence action. Like other negligence actions, the plaintiff must show a legal duty of care on the defendant's part, breach of that duty, injury to the plaintiff, and that the defendant's breach caused the plaintiff's injury. ... To establish a breach of the duty of care in a medical malpractice action, the plaintiff must show that the defendant failed to conform to the standard of care ordinarily possessed and exercised by members of the same school of medicine practiced by the defendant. That standard of care is measured by whether a reasonably careful physician of the same school of medicine as the defendant would have acted in the same manner as did the defendant in treating and caring for the patient.

Additionally, Colorado follows the corporate practice of medicine doctrine which bars claims against a hospital or corporation on the basis that they cannot practice medicine and, therefore, have no right to control a physician who is necessarily an independent contractor. *Hall v. Frankel*, 190 P.3d 853 (Colo. App. 2008) (cert denied 2009). As stated by the court in *Rosane v. Senger,* 149 P.2d 372, 374 (1944):

> A hospital, a corporation as here, can not be licensed to, and can not, practice medicine and surgery. The relation between doctor and patient is personal. That a hospital employs doctors on its staff does not make it liable

> for the discharge of their professional duty since it is powerless, under the law, to command or forbid any act by them in the practice of their profession.

The Tenth Circuit considered application of the corporate practice of medicine doctrine to private prison contractors in *Grassi v. Corrections Corp. of America*, 354 F. App'x 329 (10th Cir. 2009) (not selected for publication). Corrections Corporation of America (CCA) employed staff and nurses but contracted with a doctor of medicine to provide supervision and medical care to inmates. *Id.* at 330. The plaintiff alleged that, despite his complaints of symptoms, medical staff and the physician unreasonably delayed sending him to an outside medical facility, which found that his appendix had perforated, causing complications which then necessitated additional surgeries. *Id.* at 330-331. As to the plaintiff's tort claim for medical negligence, the Tenth Circuit held that CCA was shielded by the corporate practices of medicine doctrine from claims of medical negligence of the physician. *Id.* at 333. As to the nurses, the court found that the allegations stood on a different footing as an employer and CCA could be held liable for a nurse's negligence so long as the nurse was one of its employees and was acting within the scope of employment. *Id.*

### B. Plaintiff's Claims Based on the Conduct of Dr. Peterson are Barred by the Corporate Practice of Medicine Doctrine

While Dr. Peterson was not an employee of GEO Group, Inc., even if he were, any claims of negligence attributed to the conduct of Dr. Peterson are barred by the Corporate Practice of Medicine Doctrine.

13

### C. Plaintiff Fails to State Non-Conclusory Allegations of Medical Negligence

Plaintiff's claims of medical negligence are sparse and lack personal identification of the medical professionals or their medical specialty – save for reference to Dr. Peterson. Plaintiff states only conclusory allegations that Plaintiff had to "wait" before being transported to an outside facility or that GEO was required to request and ICE was required to approve transport to an outside medical facility for surgery and that unnamed medical staff refused to fill his prescription for pain medication written by hospital physicians but, instead, gave him "far weaker" medication and sometimes failed to include his medication on the medication cart.

In *Grassi*, 354 F. App'x at 333, while finding that a claim could be made against CCA for its employee nurse's conduct, the Tenth Circuit affirmed dismissal of claims based on the unnamed nurse's conduct, observing that:

> Plaintiffs fail to identify, however, which nurse or nurses were responsible for this alleged mistreatment or to describe with particularity the acts or omissions by them that would give rise to liability. Even more fundamentally, plaintiffs put forth no evidence establishing the standard of care required of a nursing staff in the situation presented here or whether the staff deviated from that standard. Without negligence on the part of its employees, there can be no vicarious liability for CCA.

(Internal citations omitted.) *See also Whitehead v. Marcantel*, 766 F. App'x 691, 695 (10th Cir.), *cert. denied*, 140 S. Ct. 384 (2019) (dismissing claims against "unnamed nurses").[8]

---

[8] In *Estate of Blodgett v. Correct Care Sols., LLC*, No. 17-CV-2690-WJM-NRN, 2018 WL 6528109, at *6 (D. Colo. Dec. 12, 2018), this Court permitted claims against unnamed correctional medical providers to go forward but, there, the complaint "contain[ed] excerpts of the relevant records and attache[d] relevant documents, which include the date of the document and signature of each individual" which provided defendants "with sufficient information . . . to understand the facts on which [plaintiff's] claims are premised."

Here, Plaintiff's failure to identify the medical staff that purportedly provided negligent medical care, and allegations as to how they breached an applicable standard of care, is fatal to his claim. First, if it is a physician who failed in any of these alleged duties – such as requesting return for surgery or approving prescription medications – then, as noted, the claim is barred by the corporate practice of medicine doctrine. Second, Plaintiff does not allege, for example, how long he waited before being transported to an outside facility and what the standard of care for length of time is for one's transport in a detentions setting. He alleges only that he was advised by the physician who saw him at the emergency room that he needed to return in one to two weeks.

Here, Plaintiff is represented and currently unincarcerated. "[P]risoners claiming constitutional violations by officers within the prison [ ] rarely suffer information asymmetry. . . . [because] prisoners ordinarily know what has happened to them[.]" *Gee v. Pacheco,* 627 F.3d 1178, 1185 (10th Cir. 2010). To state a plausible claim for medical negligence, Plaintiff must identify the medical professionals to which he directs his claim and the purported negligent conduct of each.

## **CONCLUSION**

For the reasons stated herein, GEO requests this Court dismiss Plaintiff's claims against it and award such costs and fees as allowed by law.

15

Respectfully submitted,

Date:  August 4, 2020

s/ Gordon L. Vaughan
Gordon L. Vaughan
VAUGHAN & DeMURO
111 South Tejon, Suite 545
Colorado Springs, CO 80903
(719) 578-5500 (phone)
(719) 578-5504 (fax)
Gvaughan@vaughandemuro.com (e-mail)
ATTORNEY FOR DEFENDANT GEO

## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of August, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

**Olivia Kohrs, Esq.**
olivia@novo-legal.com

**Danielle C. Jefferis, Esq.**
djefferis@cwsl.edu

**Laura Ellis, Esq.**
laura.ellis@usdoj.gov

s/ Gordon L. Vaughan
Gordon L. Vaughan